In re Jawad Mahmoud HASHIM and Salwa Al–Rufaiee; Jafar Hashim; Omar Hashim, Debtors.

Arab Monetary Fund, Appellant,

v.

Jawad Mahmoud Hashim and Salwa Al–Rufaiee; Jafar Hashim; Omar Hashim, Appellees.

No. 98–17128.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 18, 2000

Filed May 30, 2000

Donald L. Gaffney (argued), George H. Lyons, Lori A. Schmig, Snell & Wilmer, Phoenix, Arizona, for the appellant.

Alan A. Meda (argued), Phoenix, Arizona, for the appellees.

Before: FLETCHER, CANBY, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether the bankruptcy court erred in denying comity to a British court's unliquidated award of court costs and attorneys' fees because the award was "repugnant to the principles of American jurisprudence."

I

This is an appeal of the bankruptcy court's order disallowing three identical claims filed by the Arab Monetary Fund ("AMF") in three individual bankruptcy proceedings. The three debtors whose bankruptcies are affected by the order are the members of the nuclear family of Dr. Jawad Hashim ("Hashim"). Salwa Al–Rufaiee is his wife, and Jafar and Omar are his sons.

Hashim was the first President and Director General of the AMF, an organization headquartered in Abu Dhabi, United Arab Emirates, which has been described as the Middle Eastern Islamic counterpart to the International Monetary Fund.[1] Hashim served in his capacity as the head of the AMF from 1977 to 1982. According to his attorney, Hashim also served as planning minister to Saddam Hussein during that time as well. In 1982 or 1983, Hashim purportedly defected to Canada and declared his opposition to Hussein's rule in Iraq. Salwa and Omar had moved in 1980 to England, where Jafar attended boarding school, but the entire family apparently emigrated to Canada with Hashim two years later.

At the same time, according to the debtors, Saddam Hussein froze the family's assets in Iraq and declared Hashim a traitor. Shortly thereafter, the AMF conducted an audit of its accounts and concluded that Hashim and others had committed a "massive misappropriation and embezzlement." Hashim was purportedly convicted for his alleged crimes *in absentia* in the United Arab Emirates. When it became evident that Hashim was not disposed to return to the United Arab Emirates to face judgment, the AMF started to look for its missing moneys on foreign shores.

In December 1988, the AMF filed civil actions against the Hashims in both Canada and England, jurisdictions in which the Hashims held substantial amounts of property. In England, the AMF's claims were tried before Justice Chadwick of the Chancery Division of the English High Court of Justice. The court froze the Hashims' property to preserve any assets that might later be adjudged to be the AMF's. In 1993 and 1994, Justice Chadwick issued a four-part judgment several hundred pages in length. The bulk of the judgment relating to the Hashims was directed against Dr. Hashim, who was ordered to repay approximately US$50,000,000, in addition to more than US$80,000,000 in interest. Justice Chadwick also found that Salwa Al–Rufaiee, Jafar, and Omar held AMF property as well. He ordered Salwa to pay the AMF approximately C$199,000 (Canadian) to replace money that she had transferred in violation of the court's earlier injunction freezing the Hashims' assets. He also held that Jafar and Omar were wrongful recipients, and thus constructive trustees, of various funds and properties traceable to AMF funds, including approximately C$200,000 in cash, a Toronto property by the name of Uxbridge Farm, and two Toronto condominiums.

Of immediate relevance to the instant appeal, Justice Chadwick also held that all of the Hashims, along with other defendants, were jointly and severally liable to the AMF for its costs in the litigation (including attorneys' fees). The AMF's award of costs and attorneys' fees was not finally liquidated until August 23, 1999.

At the conclusion of the English litigation, the Hashims moved to Arizona, where

---

1. The AMF was formed by a 1976 treaty among Islamic states (including Palestine) for the purpose of "laying the monetary foundations of Arab economic integration and accelerating the progress of economic development in all Arab countries."

each of them petitioned for bankruptcy under Chapter Seven of the Bankruptcy Code, 11 U.S.C. § 701 et seq. The AMF filed a proof of claim in each case on June 15, 1995. The proof of claim adverted to a sum "in excess of $10,000,000" for the satisfaction of the English court's award of costs and attorneys' fees to the AMF. On December 6, 1995, each of the Hashims objected to the AMF's claim, asserting that the English judgment that the AMF sought to enforce was rendered in violation of the due process of law. The Bankruptcy Court issued an order on September 18, 1996, disallowing the AMF's claim in the bankruptcies of Salwa Al–Rufaiee, Jafar, and Omar, (collectively, "the Debtors") because it concluded that "saddl[ing] innocent transferees of property with $10 million in personal liability for costs" was "shocking to th[e] Court," "repugnant to the principles of American jurisprudence," and "contrary to the public policy of the United States." When it entered this order, the bankruptcy court and all of the parties were aware that the English court had not yet taxed the costs and fees for which the debtors had been held to be liable. Indeed, on the same day, the bankruptcy court lifted its automatic stay in order to permit the AMF to proceed with the taxation of costs in the English court (because the AMF's award had not been disallowed in the bankruptcy of Dr. Hashim).

The AMF filed a motion for reconsideration, arguing that the bankruptcy court's disallowance of the AMF's claim based on figures that were not yet finalized was premature and unfair. The Debtors opposed reconsideration, contending that the AMF should be estopped from insisting that its claim might be less than $10 million after unfailingly representing the claim to be at least $10 million. The bankruptcy court denied the AMF's motion to reconsider and, on February 12, 1997, entered a partial final judgment under Federal Rule of Civil Procedure 54(b) dismissing the AMF's claims for payment of the English court's award. The AMF appealed the dismissal order to the district court, which affirmed on September 30, 1998. The AMF then timely appealed to this court.

After the parties had filed their briefs in this appeal, the English court entered a default award of costs and fees to the AMF. The award amounted to approximately US$960,000. The debtors did not participate in the taxation proceeding, but they have conceded that the AMF may amend its claim to reflect the actual amount of the English court's award, and the AMF has indicated that it will do so.

## II

■ "We independently review the bankruptcy court's decision" and do not defer to the intervening decision of the district court. *Robertson v. Peters (In re Weisman)*, 5 F.3d 417, 419 (9th Cir.1993). "We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *Levin v. Maya Const. (In re Maya Const. Co.)*, 78 F.3d 1395, 1398 (9th Cir.1996) (citations omitted).

■ The bankruptcy court determined that the English court's award of costs and fees was not due comity because the amount of the award, which had been valued by the AMF at more than $10 million, was so disproportionate to the AMF's successful claims against the Debtors in the English litigation that the award was "repugnant to American jurisprudence."

■ The validity of a creditor's claim against the bankruptcy estate is governed by the state law in force in the judicial district wherein the bankruptcy is proceeding. *See Grogan v. Garner*, 498 U.S. 279, 283, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Under Arizona law, the recognition of foreign judgments is guided by the Restatement (Second) of Conflict of Laws § 98. *See Rotary Club of Tucson v. Chaprales Ramos de Pena*, 160 Ariz. 362, 773 P.2d 467, 469 (Ariz.Ct.App.1989). That authority favors recognition. It indicates that "[a] foreign nation judgment which meets

the conditions specified in Comment c will be given the same degree of recognition as a sister State judgment, ... so far as the immediate parties ... are concerned." Restatement (Second) of Conflict of Laws § 98 cmt. f (1971). The conditions specified in Comment c, in turn, include the opportunity for a full and fair trial, a court of competent jurisdiction, regular proceedings, due citation or voluntary appearance of the defendant, and lack of bias, prejudice, or fraud. *See id.* cmt. c. Because none of the parties to this litigation has alleged that the English court's judgment failed to meet any of these conditions, section 98 does not support the bankruptcy court's withholding of comity.

Nevertheless, Arizona also follows other Restatements of Law in the absence of contrary authority. *See Rotary Club,* 773 P.2d at 469 n. 2. According to the Restatement (Third) of Foreign Relations Law, a court need not recognize a judgment of a court of a foreign state if that judgment "is repugnant to the public policy of the United States or of the State where recognition is sought." Restatement (Third) of Foreign Relations Law § 482(2)(d) (1987). This is the exception to the general rule of recognition on which the bankruptcy court relied in this case. The exception should be interpreted narrowly, however, for "few judgments fall in the category of judgments that need not be recognized because they violate the public policy of the forum." *Id.* reporters' note 1. Whether a judgment for potentially oppressive attorneys' fees would do so has not been addressed in a published opinion by an Arizona court. The Fifth Circuit, however, recognized a Mexican judgment against an American citizen for attorneys' fees despite the citizen's claim that the judgment was contrary to public policy. *See Spann v. Compania Mexicana Radiodifusora Fronteriza, S.A.,* 131 F.2d 609 (5th Cir. 1942). In that case, the citizen had sued a Mexican defendant in Mexican courts and was assessed attorneys' fees when he lost. The Debtors make much of the fact that, in the course of its decision, the Fifth Circuit reserved judgment on whether the

public policy defense to recognition would have been more successful if the citizen "had been dragged into[ ] the jurisdiction of the Mexican courts." *Id.* at 611. Even if the defense would have been wholly successful in such a case, it would not be relevant here. In this case, the Debtors voluntarily resided in England, the jurisdiction in which the judgment they now hope to evade was rendered. They voluntarily moved there; they attended school there; they held substantial property there. The Debtors thus seem to be engaging in exactly the sort of strategic denouncement foreclosed by the Fifth Circuit in *Spann* when they argue that it would be shocking for them to be held to the judgment of the English court.

■ We must decline, absent grave procedural irregularities or allegations of fraud, to impugn the lawfulness of the judgments of that judicial system from which our own descended. *See Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 318 F.Supp. 161, 166 (E.D.Pa.1970) ("[W]e are, of course, mindful that the [English] system ... is the very fount from which our system developed; a system which has procedures and goals which closely parallel our own. Surely it could not be claimed that the English system is any other than one whose 'system of jurisprudence [is] likely to secure an impartial administration of justice ....' " (quoting *Hilton v. Guyot,* 159 U.S. 113, 202, 16 S.Ct. 139, 40 L.Ed. 95 (1895))), *aff'd,* 453 F.2d 435 (3d Cir.1971). This imperative is hardly attenuated when questioned only by parties who, like the Debtors, heretofore regarded the English judicial system with such esteem that they voluntarily invested and resided in its exclusive jurisdiction.

It is plain that Arizona law would not support the bankruptcy court's order denying comity to the English court's award of costs even if the award were to amount to $10 million. In any event, the award actually is less than one tenth of that sum, and the bankruptcy court's order simply cannot stand.

### III

The bankruptcy court's order disallowing the AMF's claims for costs and attorneys' fees awarded by the English court is thus REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion.