In re BIRTING FISHERIES, INC., Debtor.

Odd–Bjorn Huse, Appellant,

v.

Huse–Sporsem, A.S., Appellee.

BAP No. WW–03–1231–MACRY.

Bankruptcy No. 93–09932.

Adversary No. 03–01137.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted July 25, 2003.

Filed Oct. 3, 2003.

Michael A. Gossler, Montgomery, Purdue, Blankenship & Austin, Seattle, WA, for Odd Bjorn Huse.

John S. Kaplan, Perkins Coie, Seattle, WA, for Huse–Sporsem, A.S.

Before: MARLAR, CARROLL,[1] and RYAN, Bankruptcy Judges.

## OPINION

MARLAR, Bankruptcy Judge.

### INTRODUCTION

This appeal examines the bankruptcy court's exclusive jurisdiction to collaterally attack a state court's domestication order of a foreign judgment. The appellant filed a complaint in bankruptcy court to enjoin enforcement of the order, and renewed his state court defense that the foreign judgment conflicted with, or was precluded by, the confirmed chapter 11 plan and the Code.[2]

We conclude that the bankruptcy court had exclusive jurisdiction to determine whether the foreign judgment conflicted with bankruptcy law or bankruptcy court orders. In the absence of a conflict, we AFFIRM the bankruptcy court's summary judgment and dismissal of the complaint.

### FACTS

Birting Fisheries, Inc. ("BFI"), a Washington commercial fishing corporation, filed a chapter 11 bankruptcy petition in 1993. At that time, its owners were Huse–Sporsem, A.S. ("Huse–Sporsem"), a Norwegian corporation (75%), and Bjorn Nymark ("Nymark") (25%).

Four individuals owned equal one-fourth shares of Huse–Sporsem, including Odd–Bjorn Huse ("Huse"), the appellant herein, Nymark, Paul K. Huse, and Frank Sporsem. Huse was also BFI's vice president and manager, as well as a creditor. The sole director of Huse–Sporsem was Unni Waagsholm ("Waagsholm").

BFI's major secured lender was Christiania Bank og Kreditkassen ("CBK"). At the time of its bankruptcy filing, BFI owed CBK more than $25 million. CBK also financed Huse–Sporsem, which had pledged virtually all of its assets to CBK, except that its shares in BFI were later exempted from the collateral.

Waagsholm was not consulted concerning BFI's plan negotiations. Instead, an extraordinary general shareholders' meeting was held during February 1994 to discuss the infusion of new equity in order to "cram down" CBK. Frank Sporsem did not attend, but sent a letter stating that "our duty is to do everything to ensure

1. Hon. Peter H. Carroll, U.S. Bankruptcy Judge for the Central District of California, sitting by designation.

2. Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

that [Huse–Sporsem] remains the owner of BFI ...." Norwegian Judgment[3] at 18. Paul Huse, Huse, and Nymark signed the minutes, whereby it was resolved that Huse–Sporsem did not have enough funds to contribute new equity, but that the shareholders had preferential rights in the event of the infusion of new capital. The Plan and Disclosure Statement, filed in May 1994, indicated that the individual shareholders would contribute a total of $250,000 for their participation rights in the reorganized debtor. However, that amount was insufficient to satisfy CBK and the plan was not confirmed.

In June, the amount of new value was increased to $1 million in the First Amended Plan and First Amended Disclosure Statement. Frank Sporsem decided he could not make the new value payment and instead agreed to take a cash payment in exchange for his release of his interest in BFI. He signed an agreement to that effect in August 1994.

Around the same time, in June 1994, BFI, Huse–Sporsem, and others initiated lender liability claims against CBK seeking $25 million in damages. In August, the parties reached a global settlement ("Settlement"). Briefly, CBK agreed to restructure BFI's debt in order to facilitate repayment, to write off all of Huse–Sporsem's obligations to CBK-a value in excess of $10 million, and to release any claims against BFI and the individual shareholders of Huse–Sporsem. In return, the lender liability claims were released.

The parties also agreed to a restructuring of BFI's ownership, whereby the BFI shareholders would transfer their stock to a new general partnership to be known as Bochica Partners ("Bochica"). Bochica's ownership consisted of Nymark, Paul Huse, Huse, and Mark Steel. The Settlement was signed by the four shareholders of Huse–Sporsem, including Frank Sporsem.

In the latter part of August 1994, BFI then filed a Second Amended Plan ("Plan") and Second Amended Disclosure Statement. The Plan incorporated the substance of the Settlement concerning the transfer of ownership to the new general partnership. However, unlike the previous plans, this Plan did not require any infusion of new value. The Plan expressly retained bankruptcy court jurisdiction to interpret and enforce it.

The Plan was confirmed on September 30, 1994 ("Confirmation Order"), and the stock was transferred. Huse, for no "new value" consideration, now owned nearly 30% of the reorganized debtor.

The 1995 fishing season was prosperous. CBK accepted an early loan payoff and wrote off almost $8 million in BFI's debt. This good fortune resulted in $10 million equity for BFI. In January 1996, Norway Seafoods, AS, an unrelated company, purchased BFI for $9.35 million. Huse and Nymark personally received a total $3 million consideration/debt cancellation.

In 1996, Frank Sporsem learned about the sale and large profit, and launched an investigation. In 1997, the Plan was substantially consummated and a final decree was entered.

### Norwegian Judgment

In 1998, Frank Sporsem initiated a shareholder derivative suit under the Norwegian Companies Act ("Companies Act") against Huse and others in Norway. At

---

**3.** "Norwegian Judgment" refers to the certified translation of the judgment entered on August 27, 2001 by the Kingdom of Norway's Court of Appeal for the More and Romsdal District, Case No. 00–00878 A. *See* Decl. of Ramer B. Holtan, Jr. (March 10, 2003), at 2, ¶ 2 and exhibit A.

the same time, Huse–Sporsem was being liquidated in Norway. The suit, on behalf of Huse–Sporsem, alleged that Huse had violated Section 15–1 of the Companies Act,[4] and sought damages for their loss of the BFI shares when they were transferred to Bochica for no consideration.

Huse fully litigated the merits of the action and raised, as a defense, the *res judicata* effect of the confirmed Plan. The Norwegian court ultimately entered judgment against Huse for breach of fiduciary duty and fraud, and ordered him to pay Huse–Sporsem $9 million in compensation.

Huse appealed the decision, and the Norwegian Court of Appeal proceedings took place between April and May 2001. The parties appeared and presented evidence: the Court of Appeal examined six witnesses and several new documents.

In August 2001, the Court of Appeal affirmed the judgment of compensation to Huse–Sporsem for the loss of its shares in BFI, but reduced the damages to $6.7 million. The damages were calculated using the value of Huse–Sporsem's 75 percent interest in BFI when the stock was transferred, which the Court of Appeal valued at $9 million. *See* Norwegian Judgment at 23.

The Norwegian Judgment was memorialized in a careful and articulate 30–page decision, in which the Court of Appeal considered Huse's federal bankruptcy law arguments. The Court of Appeal found that the purported new value demand from CBK was "more likely ... invented as part of [BFI's] strategy from the outset ... to sever the ties between [Huse–Spor-

sem] and [BFI]." *Id.* at 21. It found that Huse did not inform Waagsholm about the ongoing negotiations and developments. It concluded that Huse violated his duty to act in the interests of Huse–Sporsem and his co-shareholders and was therefore liable under the Companies Act.

Concerning the transfer of ownership to Bochica and the Confirmation Order, the Court of Appeal stated:

> It has been submitted by [Huse] that the question of new ownership was decided with legal and binding force through the Bankruptcy Court's order for a release from "Chapter 11." As regards this issue, the Court of Appeal is in doubt, but does nevertheless not find this to be decisive. The subject matter of the action is in reality whether [Huse]—as a shareholder of [Huse–Sporsem] and given his position with BFI-has acted in a manner entailing liability for damages partly through his contribution to inventing an unnecessary precondition for new ownership of the [BFI] shares, partly by leading [Huse–Sporsem]—represented by the sole director and one co-shareholder (Mr. Sporsem)—up the garden path as regards the dropping of the capital requirement, after which the [BFI] shares ultimately landed in new hands. In the Court's opinion, this issue must be considered under the liability rules of the Norwegian Companies Act.

Norwegian Judgment at 21.

### Huse's Opposition to Enforcement

In September 2002, Huse–Sporsem registered the Norwegian Judgment in Wash-

---

4. Section 15–1 of the Companies Act, as quoted by the Norwegian Court of Appeal, provides:

 A promoter, a board member, a member ·of the corporate assembly or of the committee of shareholders' representatives as well as the Managing Director are liable for compensation for any damage which they have in the exercise of their duties intentionally or negligently caused the company, a shareholder or others. The same applies to anyone who in his capacity of shareholder willfully or negligently contributes to such damage.

 Norwegian Judgment at 21–22.

ington state court and initiated an action for recognition and enforcement, pursuant to Washington's Uniform Foreign Money–Judgments Recognition Act ("UFMJRA"). *See* Wash. Rev.Code Ann. §§ 6.40.010 to 6.40.915 (West 1995). Huse opposed the action, arguing that the Norwegian Judgment conflicted with the confirmed Plan and was barred by *res judicata.*

After hearing argument, the state court determined that the Norwegian Judgment was outside the scope of the Confirmation Order. In January 2003, the state court denied Huse's motion and enforced the Norwegian Judgment. Huse's appeal of that order was pending when he finally sought relief in the bankruptcy court. In March 2003, Huse filed, in bankruptcy court, a motion to enjoin enforcement of the Norwegian Judgment and for declaratory relief; it was converted by the court into an adversary proceeding. Huse sought (1) a declaratory judgment that the Norwegian Judgment was barred by specific Plan and Code provisions, and (2) injunctive relief to prohibit enforcement of the Norwegian Judgment in state court.

Huse–Sporsem opposed the relief and moved to dismiss. It argued that the state court order recognizing and enforcing the Norwegian Judgment was *res judicata.* Furthermore, it maintained that the Plan did not release nondebtor liability.

The court deemed Huse's pleading to be both a complaint and a motion for summary judgment. After a hearing,[5] an order denying the relief and dismissing the matter was entered. Huse filed a timely notice of appeal.

**5.** There is no transcript of this hearing in the excerpts of record. Therefore, we are unable to ascertain the bankruptcy court's reasoning.

**6.** A motion to dismiss may be treated as one for summary judgment, under Fed. R. Bankr.P. 7056/Fed. R. Civ. P. 56, if matters

## ISSUES

1. Whether the bankruptcy court had jurisdiction to consider a collateral attack upon, or enjoin enforcement of, the state court order.

2. Whether the Norwegian Judgment conflicted with the confirmed Plan or the Code.

## STANDARD OF REVIEW

 We review a summary judgment *de novo.*[6] *Kipperman v. Proulx (In re Burns),* 291 B.R. 846, 849 (9th Cir. BAP 2003). Questions of law and mixed questions of law and fact are reviewed *de novo. See Ragsdale v. Haller,* 780 F.2d 794, 795 (9th Cir.1986); *Bakonyi v. Boardroom Info. Sys. (In re Quality Laser Works),* 211 B.R. 936, 940 (9th Cir. BAP 1997), *aff'd mem.,* 165 F.3d 37 (9th Cir.1998) (mixed questions of law and fact are where the historical facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule).

 In this appeal, the facts are undisputed, and we must determine whether the bankruptcy court correctly applied the relevant substantive law. *See Jacobson,* 50 F.3d at 1496; Fed. R. Bankr.P. 7056. We may affirm the bankruptcy court's grant of summary judgment on any ground supported by the record. *See Weiser v. United States,* 959 F.2d 146, 147 (9th Cir.1992).

## DISCUSSION

### A. The Bankruptcy Court's Jurisdiction

 "Federal courts are always under an independent obligation to examine their outside the pleadings are submitted and the parties are given adequate opportunity to brief the issues involved. *See Jacobson v. AEG Capital Corp.,* 50 F.3d 1493, 1496 (9th Cir.1995). Both conditions were satisfied in this case.

own jurisdiction." *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir.2000) (internal citation omitted). Moreover, we must satisfy ourselves of the bankruptcy court's subject matter jurisdiction. *See Arizonans For Official English v. Arizona*, 520 U.S. 43, 73, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Subject matter jurisdiction is a question of law. *See Pavelich v. McCormick et al. LLP (In re Pavelich)*, 229 B.R. 777, 779 (9th Cir. BAP 1999).

■ A complaint for injunctive relief calls upon the bankruptcy court's equitable power under § 105, which grants the court broad power to "issue any order . . . necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "Under Section 105, the bankruptcy court can issue an injunction to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to a case before it." *Goldin v. Primavera Familienstiftung, Tag Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337 n. 23 (Bankr.S.D.N.Y.1996).[7]

■ However, § 105(a) does not confer subject matter jurisdiction. "Subject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Subject matter jurisdiction is the court's authority to entertain an action between the parties before it. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction." *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 624 (9th Cir. 1989). Therefore, in order to enjoin the enforcement of the state court order, the bankruptcy court first had to establish its jurisdiction.

■ By the time of the latest round of bankruptcy court proceedings, the state court had already entered its order recognizing and enforcing the Norwegian Judgment, and eight and one-half years had elapsed since Plan confirmation on September 30, 1994. Rules of federal and state comity establish that federal courts are required to give prior state court judgments the same preclusive effect as the state court that rendered the judgment.[8]

7. The legislative history of § 105(a) clearly indicates that this provision was intended to be a statutory exception to the Anti-Injunction Act, 28 U.S.C. 2283, which provides that "a court of the United States may not grant an injunction to stay proceedings in a State court *except as expressly authorized by Act of Congress,* or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1994) (emphasis added). *See* H.R.Rep. No. 95–959, 95th Cong., 1st Sess., at 316–17 (1977), *reprinted in,* 1978 *U.S.C.C.A.N.* 5787, 5815 (stating that § 105 is "an authorization, as required under 28 USC 2283, for a court of the United States to stay the action of a State court"); S.Rep. No. 989, 95th Cong., 2d Sess., at 29 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5814–15 (same). *See also James v. Draper (In re James),* 940 F.2d 46, 51 (3d Cir.1991); *In re Raphael,* 238 B.R. 69, 83 (D.N.J.1999).

It is unclear whether the Anti–Injunction Act applies to bankruptcy courts. The Ninth

Circuit has held that the Anti–Injunction Act barred a bankruptcy court's order enjoining a state court action in *McQuaid v. Owners of NW 20 Real Estate (In re Fed. Shopping Way, Inc.),* 717 F.2d 1264, 1274 (9th Cir.1983). Since that time, however, the Ninth Circuit has also held that a bankruptcy court is not a "court of the United States" as that term is defined in 28 U.S.C. § 451, and used in 28 U.S.C. § 2283. *See Perroton v. Gray (In re Perroton),* 958 F.2d 889, 893 (9th Cir.1992). Nonetheless, case law concerning the Anti–Injunction Act may be instructive.

8. In Washington, *res judicata* will preclude the relitigation of a claim if it is identical to the claim in the prior action in four respects: "(1) subject matter; (2) cause of action; (3) persons and parties; and (4) the quality of the persons for or against whom the claim is made." *Rains v. State,* 100 Wash.2d 660, 663, 674 P.2d 165, 168 (1983). If the parties are identical, the quality of the persons is also

*See* 28 U.S.C. § 1738 ("Full Faith and Credit" statute); *Gayden v. Nourbakhsh (In re Nourbakhsh),* 67 F.3d 798, 801 (9th Cir.1995). Additionally, the *Rooker–Feldman* doctrine provides that the United States Supreme Court is the only federal court that may review an issue previously determined or "inextricably intertwined" with the previous action in state court between the same parties. *See D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (district court does not have jurisdiction "over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional"); *Rooker v. Fid. Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923) (state court ruling on federal constitutional questions in the state court action could not be modified or reversed by district court).⁹

■ When a matter comes within the bankruptcy court's exclusive jurisdiction, however, general preclusion rules and the *Rooker–Feldman* doctrine do not apply. *See Kalb v. Feuerstein,* 308 U.S. 433, 438–39, 60 S.Ct. 343, 84 L.Ed. 370 (1940) ("Congress, because its power over the subject of bankruptcy is plenary, may by specific bankruptcy legislation create an exception to that principle and render judicial acts taken with respect to the person or property of a debtor whom the bank-

ruptcy law protects nullities and vulnerable collaterally"); *Mozes v. Mozes,* 239 F.3d 1067, 1085 n. 55 (9th Cir.2001) (because *Rooker–Feldman* doctrine "is one of congressional intent, not constitutional mandate, it follows that where Congress has specifically granted jurisdiction to the federal courts, the doctrine does not apply"); *Contractors' State License Bd. v. Dunbar (In re Dunbar),* 245 F.3d 1058, 1060 (9th Cir.2001) (state court modifications of the automatic stay do not preclude, under the doctrines of collateral estoppel and res judicata, federal relitigation of the stay's scope and applicability); *Gruntz v. County of Los Angeles (In re Gruntz),* 202 F.3d 1074, 1083 (9th Cir.2000) (automatic stay and *Rooker–Feldman*); *Ruvacalba v. Munoz (In re Munoz),* 287 B.R. 546, 556 (9th Cir. BAP 2002) (Section 524(a)(1) discharge injunction "operates as a statutory exception" to the Full Faith and Credit statute and permits collateral attack of nonbankruptcy court judgments in bankruptcy court notwithstanding the *Rooker–Feldman* doctrine); *Pavelich,* 229 B.R. at 781–83.

■ The first question we must address, therefore, is whether the bankruptcy court had exclusive jurisdiction to construe the Plan and Confirmation Order in this case. A bankruptcy court has original and *exclusive* jurisdiction over bankruptcy cases. *See* 28 U.S.C. § 1334(a). The bankruptcy court's exclusive jurisdiction

identical. *See id.,* 100 Wash.2d at 664, 674 P.2d at 169.

Washington also employs a four-part test to analyze whether previous litigation of an issue should have a collateral estoppel effect; it requires: "(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied." *Hadley v. Maxwell,* 144 Wash.2d 306, 311, 27

P.3d 600, 602 (2001) (internal quotation omitted).

9. Here, the pending appeal of the state court order did not affect finality for *res judicata* or *Rooker–Feldman* purposes. *See In re Metcalf,* 92 Wash.App. 165, 175 n. 6, 963 P.2d 911, 917 n. 6 (1998) (citing authority); *Williams v. Swenson (In re Williams),* 280 B.R. 857, 863 (9th Cir. BAP 2002) (*Rooker–Feldman* doctrine applies regardless of whether the state court judgment is on appeal).

encompasses "all matters *connected with* the bankruptcy estate." *Gruntz*, 202 F.3d at 1080 (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)) (emphasis added).

In *Gruntz*, the Ninth Circuit further explained that exclusive jurisdiction exists over "core" proceedings. *See Gruntz*, 202 F.3d at 1081 ("[T]he separation of 'core' and 'non-core' proceedings ... creates a distinction between those judicial acts deriving from the plenary Article I bankruptcy power and those subject to general Article III federal court jurisdiction."); *see also* 28 U.S.C. § 157. A "'core proceeding' is one 'that invokes a substantive right provided by title 11 or ... a proceeding that, by its nature, could arise only in the context of a bankruptcy case.'" *Gruntz*, 202 F.3d at 1081 (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987)). Put another way, "core" proceedings are those that "arise under the Bankruptcy Code or arise in a bankruptcy case." *McCowan v. Fraley (In re McCowan)*, 296 B.R. 1, 3 (9th Cir. BAP 2003).

For example, core proceedings include, but are not limited to: confirmation of plans (28 U.S.C. § 157(b)(2)(L)); motions to terminate, annul, or modify the automatic stay [or permanent discharge injunction of § 524] (28 U.S.C. § 157(b)(2)(G)), *see McGhan v. Rutz (In re McGhan)*, 288 F.3d 1172, 1179 n. 9 (9th Cir.2002) (actions relating to the § 524 discharge are "core" proceedings); and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship ...." (28 U.S.C. § 157(b)(2)(O)).

In addition, a bankruptcy court's original core jurisdiction "continues" in order for it to enforce its orders, even after the case has been closed. *See McCowan*, 296 B.R. at 3–4 (bankruptcy court has "ancillary" jurisdiction over process in aid of and to effectuate its judgment of nondischargeability under § 523) (citing *Peacock v. Thomas*, 516 U.S. 349, 356, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996)). "A Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant." *Gonzales v. Parks (In re Gonzales)*, 830 F.2d 1033, 1036 (9th Cir.1987). A federal court always has subject matter jurisdiction "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379–80, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

Furthermore, where bankruptcy court jurisdiction has been expressly retained, it will be construed as exclusive, so as not to render the provision a nullity. *See United States v. Alpine Land & Reservoir Co.*, 174 F.3d 1007, 1013 (9th Cir. 1999); *Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir.1998) ("it would make no sense for the district court to retain jurisdiction to interpret and apply its own judgment to the future conduct contemplated by the judgment, yet have a state court construing what the federal court meant in the judgment").

For the foregoing reasons, it is clear that the bankruptcy court, here, had exclusive "arising under" jurisdiction (28 U.S.C. § 1334(a)) over the core bankruptcy issues presented.

That is not to say, however, that a nonbankruptcy court lacks jurisdiction over all bankruptcy issues which may arise in the nonbankruptcy forum. In addition to its exclusive § 1334(a) jurisdiction, a bankruptcy court also has "original but *not exclusive* jurisdiction of all civil *proceedings arising under title 11, or arising in or related to cases under title 11*." 28

U.S.C. § 1334(b) (emphasis added). This statute appears to contradict the aforementioned definition of exclusive authority, for *nonexclusive* jurisdiction might also apply to some "core" proceedings which "arise under" the Code or "arise in" bankruptcy cases. *See* 28 U.S.C. §§ 157(b)(1), 1334(b).

In *Gruntz,* the Ninth Circuit explained that 28 U.S.C. § 1334(b) does not create jurisdiction in nonbankruptcy courts over core bankruptcy matters, and thus any argument that the state had concurrent jurisdiction was "unavailing." *Gruntz,* 202 F.3d at 1082–83. Nonetheless, it concluded that a state court judgment could be given preclusive effect in bankruptcy court if it "does not involve a core proceeding that implicates substantive rights under title 11." *Id.* at 1084. *Gruntz* held that the normal rules of preclusion, including the *Rooker–Feldman* doctrine, did not apply to the state court's order *modifying* the automatic stay, because modification of the stay "is vested exclusively in the bankruptcy court" under § 362. *Id.*

This reasoning was relied upon in *McGhan.* There, the state court had determined that a creditor had not received notice of a bankruptcy proceeding and, therefore, it allowed the creditor's action on a discharged debt to proceed. In effect, the state court modified the § 524 permanent discharge injunction as to the creditor. *McGhan,* 288 F.3d at 1180. The Ninth Circuit held that a state court could not modify the bankruptcy court's discharge order or permanent discharge injunction. Relying on *Gruntz'* "broader

implications," it stated that "state court *intrusions* on all 'bankruptcy court orders' *(or other 'core' bankruptcy proceedings)*" are barred. *Id.* at 1179 (emphasis added).

Significantly, the *McGhan* court opined that a state court is *not* "divested of all jurisdiction to construe or determine the applicability of a discharge order *when discharge in bankruptcy is raised as a defense* to a state cause of action filed in state court," but rather that a state court *exceeds its jurisdiction* if it "goes further." *See id.* at 1180 (emphasis added). In *McGhan,* the discharge order and discharge injunction "plainly barred" the creditor's action. *Id.* Therefore, "going further" apparently meant, in *McGhan,* that the state court erred in its ruling.[10]

In the Ninth Circuit, therefore, bankruptcy courts are not bound by incorrect state court judgments in core matters that fall within a bankruptcy court's "arising under" jurisdiction. *See McGhan,* 288 F.3d at 1180; *Pavelich,* 229 B.R. at 784 ("the state court has jurisdiction to construe the bankruptcy discharge correctly, but not incorrectly"). *See also Gruntz,* 202 F.3d at 1083 ("even assuming that the states had concurrent jurisdiction, their judgment would have to defer to the plenary power vested in the federal courts over bankruptcy proceedings").

The same rationale for exclusive jurisdiction applies to core plan confirmation issues. *See McGhan,* 288 F.3d at 1179; *cf. Lenke v. Tischler (In re Lenke),* 249 B.R. 1, 8 (Bankr.D.Ariz.2000) ("the motivating principle of *Gruntz* is clearly the bankrupt-

---

**10.** *Gruntz* and *McGhan* reaffirm well-established law that federal-state comity does not come into play if the state court proceedings are a legal nullity and thus void *ab initio* for lack of subject matter jurisdiction. *See Audre, Inc. v. Casey (In re Audre, Inc.),* 216 B.R. 19, 29 (9th Cir. BAP 1997) (a "void" judgment is one "which from its inception was a complete

nullity and without legal effect"); *Owens–Corning Fiberglas Corp. v. Cent. Wholesale, Inc. (In re Cent. Wholesale, Inc.),* 759 F.2d 1440, 1448 (9th Cir.1985) (a judgment "is void only if the court that rendered judgment lacked jurisdiction of the subject matter, or of the parties, or if the court acted in a manner inconsistent with due process of law").

cy courts' plenary power over core matters"). In other words, a state court's jurisdiction to construe a discharge order is no different from its jurisdiction to construe a chapter 11 plan and confirmation order, if the plan is raised as a *res judicata* defense in the state court proceeding, such as the domestication action at issue here.

Nonetheless, we proceed cautiously in applying the Ninth Circuit rule to the interpretation and enforcement of a confirmed plan. A plan is traditionally interpreted under state contract law. At the same time, it is a bankruptcy court order.

The real question is whether substantive bankruptcy law issues have been implicated. If there are no substantive bankruptcy law issues raised, then "[t]here is no reason to declare that the mere fact that a bankruptcy decree has issued requires that any and all further proceedings be in the bankruptcy court." *Hinduja v. Arco Prods. Co.*, 102 F.3d 987, 989–90 (9th Cir. 1996) (nonbankruptcy court had jurisdiction to enforce a bankruptcy court's settlement order because the action was a "simple matter of enforcing contract law").[11]

In light of the foregoing authorities, examples of appropriate state court jurisdiction over reorganization plans might include actions which (1) only involve contract law, (2) where jurisdiction has not been reserved, or (3) where the bankruptcy court's implementation of its order is no longer necessary to carry out the reorganization.

█ In this case, interpretation of the confirmed Plan required more than the application of simple contract law. It involved an issue as to whether a nondebtor's rights, as allegedly established in the Plan, prevented his fellow shareholders from suing him derivatively. Therefore, the bankruptcy court had exclusive jurisdiction to interpret and enforce its Plan and Confirmation Order in order to determine whether the state court's *res judicata* determination was correct. As odd as it may sound, the state court would only exceed its jurisdiction over Huse's *res judicata* defense if it had construed the Plan incorrectly. *See McGhan*, 288 F.3d at 1180. Ultimately, the bankruptcy court correctly found that the state court properly determined the impact of the confirmed Plan on third parties.[12]

---

**11.** In *Hinduja*, the Ninth Circuit cited *Sanders v. City of Brady (In re Brady, Texas, Mun. Gas Corp.)*, 936 F.2d 212 (5th Cir.1991). In *Sanders*, the Fifth Circuit held that the state court had concurrent jurisdiction to hear a damage claim arising from a rejected executory contract under § 365 and the terms of the confirmed chapter 11 plan, even though the bankruptcy court had retained jurisdiction under the plan. It further affirmed the state court's authority to rule on the *res judicata* effect of the plan. *Id.* at 218–19. The Fifth Circuit took a narrow view of the bankruptcy court's 28 U.S.C. § 1334(a) jurisdiction, as only pertaining to the "bankruptcy petition itself." *Id.* at 218. It classified the litigation as falling under the concurrent jurisdiction of 28 U.S.C. § 1334(b). *Id.* There is some tension, therefore, between *Hinduja* and the broader interpretation of the bankruptcy court's 28 U.S.C. § 1334(a) exclusive jurisdic-

tion in *McGhan* and *Gruntz*, which we do not purport to resolve herein.

**12.** This result is compatible with analyses under the Anti–Injunction Act. *See supra* note 7. The Supreme Court has restricted the application of the Act's "relitigation" exception (to protect or effectuate the federal court's judgments) when a state court has already exercised its *concurrent* jurisdiction to make a *res judicata* ruling. The Court stated:

We believe that the Anti–Injunction Act and the Full Faith and Credit Act can be construed consistently, simply by limiting the relitigation exception of the Anti–Injunction Act to those situations in which the state court has not yet ruled on the merits of the res judicata issue. Once the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act

### B. Domestication of the Norwegian Judgment

■ The recognition and enforcement of the Norwegian Judgment was governed by Washington's domestication statute, the UFMJRA, which distills and supplants the common law of comity.[13] *Fowler*, 118 Wash.2d at 726, 826 P.2d at 208. The UFMJRA governs the domestication of foreign money judgments (other than judgments for taxes, fines or other penalties, or support in matrimonial or family matters), which are "final and conclusive" and enforceable where rendered. *See* Wash. Rev.Code Ann. §§ 6.40.010(1)(2), 6.40.020 (West 1995).

■ A judgment is "conclusive," within the meaning of the UFMJRA, to the extent that it grants or denies recovery of a sum of money and the foreign court (1) had subject matter and personal jurisdiction over the defendant, and (2) the judgment was rendered under a system that provided impartial tribunals and procedures compatible with due process. *See* Wash. Rev.Code Ann. § 6.40.040(1)(a)–(c) (West 1995).

■ A foreign judgment need not be recognized if, among other things: (1) the claim for relief on which the judgment is based is repugnant to the public policy of the forum state; (2) "the judgment conflicts with another final and conclusive judgment"; or (3) the proceeding in the foreign court was contrary to an agreement between the parties under which the

---

becomes applicable and federal courts must turn to state law to determine the preclusive effect of the state court's decision. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 524, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986).

However, when the federal court has exclusive jurisdiction, it does not violate full faith and credit, the *Rooker–Feldman* doctrine or the Anti–Injunction Act by enjoining a state court proceeding. The reason is that the federal court's decision "rest[s] on its own determination that it ha[s] exclusive jurisdiction, not on any error on the part of the state court in asserting jurisdiction." *See Alpine Land & Reservoir Co.*, 174 F.3d at 1015–16 (district court had continuing and exclusive *in rem* jurisdiction to enjoin state court proceeding).

13. It is undisputed that state court had subject matter jurisdiction over the domestication action. Although Huse raised federal questions in his complaint, Huse–Sporsem did not seek to domesticate the Norwegian Judgment in federal court, and therefore, the bankruptcy court was not called upon to domesticate the judgment under federal law.

The domestication of foreign judgments in the United States is not governed by a treaty or by federal statute. *See* 18B Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Fed. Prac. & Proc.: Juris.2d* § 4473 (2002). In state court actions and federal diversity of citizenship actions, the recognition and enforcement of foreign judgments is governed by state law. *See id.; British Midland Airways Ltd. v. Int'l Travel, Inc.*, 497 F.2d 869, 871 n. 2 (9th Cir.1974) (applying Washington law to enforce an English judgment in a diversity action in district court). *See also Restatement (Second) of Conflict of Laws* § 99, cmt. a. (1971). State law is applied, even if a civil action is brought in federal court. *See Tonga Air Servs., Ltd. v. Fowler*, 118 Wash.2d 718, 726, 826 P.2d 204, 208 (1992) (the recognition of foreign judgments is "governed by applicable state law, even when that recognition is sought in federal court"). *Cf. Arab Monetary Fund v. Hashim (In re Hashim)*, 213 F.3d 1169, 1171 (9th Cir.2000) (validity of creditor's claim based on foreign judgment was to be determined under state law); *cf.* Fed. R. Bankr.P. 7069(a) (applying state law to enforce federal judgments).

When only federal questions are involved, however, "there is no apparent reason to consult state law, and federal courts routinely determine the *res judicata* effects of foreign judgments without any reference to state law." Wright et al., *supra*. A federal court will apply general comity principles, as restated in the *Restatement (Third) of Foreign Relations Law* §§ 481, 482 (1987). *See Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1003 (9th Cir.1987) (*Restatements* are an appropriate starting point for applying federal common law).

dispute was to be settled other than by proceedings in a foreign court. *See* Wash. Rev.Code Ann. § 6.40.040(2)(c)-(e) (West 1995).

Huse has not argued that he was not afforded due process in the Norwegian courts. Therefore, unless the state court erred in its ruling that the Norwegian Judgment did not conflict with the confirmed Plan and Code, its order was enforceable.

### 1. 11 U.S.C. § 1141: Binding Effect of Plan

 The terms of a confirmed plan are binding on all parties, such as the debtor and any creditor, equity security holder, or general partner of the debtor, whether or not such party has accepted the plan. *See* 11 U.S.C. § 1141(a). All questions that were or could have been raised pertaining to the plan are entitled to *res judicata* effect. *See Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1143 (9th Cir.2002) (citing *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995)) (citations omitted).

 Generally, the doctrine of *res judicata* (claim preclusion) bars the relitigation of a cause of action if four elements are present: (1) the parties in the two actions are identical; (2) the prior judgment was rendered by a court of competent jurisdiction; (3) there is a final judgment on the merits; and (4) the same cause of action is involved in both cases. *Heritage Hotel Ltd. P'ship I v. Valley Bank of Nev. (In re Heritage Hotel P'ship I)*, 160 B.R. 374, 376–77 (9th Cir. BAP

1993), *aff'd mem.*, 59 F.3d 175 (9th Cir. 1995).

 Only the fourth element is at issue in this appeal. In determining whether successive claims constitute the same cause of action, we consider:

(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201–02 (9th Cir.1982).

 First, Huse maintains that the Norwegian Judgment effectively redivided the BFI ownership interests that were finally determined by the Plan. Next, Huse contends that the transfer of ownership pursuant to the Settlement, and as perpetuated in the Plan, finally determined the issue of Huse–Sporsem's entitlement to any interest in Bochica-specifically, that Huse–Sporsem was *not* entitled to any interest since it had agreed to the transfer to new and different owners. Thus, according to Huse, the Plan adjusted the shareholders' rights and released all of their claims concerning their interests in BFI and Bochica, including any claims against Huse for liability related to the transfer. In a clearly inconsistent argument, Huse also concedes that the Plan did not expressly purport to discharge him personally.[14] *See* 11 U.S.C. § 524(e) (pro-

---

14. Huse's inconsistent position in relation to the express terms of the confirmed Plan, which has been advanced solely to gain an advantage in bankruptcy court, invokes the doctrine of judicial estoppel. *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.2001).

Huse also maintains that Frank Sporsem and Huse–Sporsem waived their rights to any compensation for the BFI shares and were estopped from initiating the claim in Norway. Waiver and estoppel are affirmative defenses that could and should have been raised in Norway. In addition, "he who seeks equity

viding that the bankruptcy discharge of the debtor "does not affect the liability of any other entity on, or the property of any other entity for, such debt").[15]

A discharge or injunction is sometimes negotiated as part of a settlement in order to prevent the bringing of actions based upon the matter which has been settled in the bankruptcy case. *See In re All Am. of Ashburn, Inc.*, 805 F.2d 1515, 1517 (11th Cir.1986). Huse's perception that all of his liability and Huse–Sporsem's rights were settled and thus included in the Plan is incorrect. The Settlement's release provision only covered global mutual releases of claims between CBK and BFI and others. Neither the Settlement nor the Plan provided for a discharge of, or injunction against, Huse's personal liability as a shareholder of Huse–Sporsem, nor did they contain any indemnification provision for Huse's liability as BFI's general manager.[16] In the absence of such provisions, the Plan did not address or deal with the corporate liability issues central to the Norwegian Judgment. Moreover, the Norwegian Court of Appeal specifically stated that it was not deciding ownership rights. *See* Norwegian Judgment at 21.

In order to utilize an injunction in this manner, the Norwegian litigation would have to be "related to" the bankruptcy case and the injunction must be necessary to the reorganization effort. *See Celotex Corp.*, 514 U.S. at 307–09, 115 S.Ct. 1493 (upholding a § 105(a) injunction in suit between nondebtors issued by a bankruptcy court as within its 28 U.S.C. § 1334(b) "related to" jurisdiction because of its effect on the bankruptcy estate); *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 615 (9th Cir. BAP 1990) ("section 105 permits the court to issue both preliminary

---

must come into the court with clean hands." *Hocker v. N.H. Ins. Co.*, 922 F.2d 1476, 1486 (10th Cir.1991).

**15.** We do not address two additional arguments which were not developed in the argument and which, nonetheless, go beyond the scope of this appeal. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (appellate arguments not presented "squarely and distinctly" are deemed waived.) Huse states that the Plan precluded any finding of liability based on his misconduct concerning "new value" because there was no new value provision. However, the Norwegian Court of Appeal found liability in the events leading up to confirmation. Huse also suggests that Frank Sporsem lacked standing in Norway. That issue should have been raised there.

**16.** Such a use of § 105 power to enjoin third-parties runs counter to Ninth Circuit law that strictly enforces § 524(e) of the Code. *See Am. Hardwoods*, 885 F.2d at 626 (section 524(e) displaces the court's equitable power under § 105 to order the discharge, via injunction, of nondebtors).

The trend among bankruptcy courts, nevertheless, has been to confirm chapter 11 plans with express discharge or indemnification provisions for nondebtors if they meet certain tailored criteria or overall necessity. *See In re WCI Cable, Inc.*, 282 B.R. 457, 467–80 (Bankr.D.Or.2002) (provision in plan purporting to settle the debtor's claims and to enjoin any party from thereafter asserting claims was acceptable; indemnification and exculpation clauses can be included as a product of negotiation among interested parties, including debtor's officers, directors, employees and agents). *See also In re PWS Holding Corp.*, 228 F.3d at 224, 245–46 (3d Cir.2000) (plan insulating committee members and professionals from liability except for their willful misconduct or gross negligence); *In re Dow Corning Corp.*, 280 F.3d 648, 653 (6th Cir. 2002), *cert. denied sub nom. Class Five Nev. Claimants v. Dow Corning Corp.*, 537 U.S. 816, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002) (under certain circumstances a court may enjoin a nonconsenting creditor's claim against a non-debtor to facilitate a chapter 11 plan); *In re Seatco, Inc.*, 259 B.R. 279, 284 (Bankr. N.D.Tex.2001) (injunction to prevent pursuit of nondebtor guarantor was necessary and appropriate to carry out the plan); *In re Shaw Aero Devices, Inc.*, 283 B.R. 349, 352–53 (Bankr.M.D.Fla.2002) (plan could enjoin lawsuit against debtor's sole shareholder).

and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate.").

■ The test for "related to" jurisdiction is "whether the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Fietz v. Great W. Sav. (In re Fietz)*, 852 F.2d 455, 457 (9th Cir.1988) (emphasis omitted) (adopting test in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)). Here, the Norwegian Judgment had no impact on BFI's ability to reorganize, as it was only a judgment against nondebtor Huse. The Plan and Confirmation Order did not address Huse's liability under Norwegian corporate law, and a court lacks jurisdiction to enforce an order it did not make. *See Fed. Shopping Way*, 717 F.2d at 1270. Since the Plan and the Norwegian action were not the "same cause of action," the Plan did not preclude enforcement of the Norwegian Judgment on *res judicata* grounds.

### 2. 11 U.S.C. §§ 1125(e) and 1144

Huse also maintains that the Norwegian Judgment violated the Code. First Huse argues that, since the bankruptcy court found that the Plan had been proposed in good faith, he was entitled to immunity from liability under the "safe harbor" provision of § 1125(e). This section provides:

A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for

violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e).

This section is only applicable to the offering and selling of securities in the event there is a conflict between the protections of the Code and liability under § 10(b) of the Securities Exchange Act of 1984 and Rule 10b–5. *See* 7 *Collier on Bankruptcy*, ¶ 1125.03[7], at 1125–27–28 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003). The Norwegian Judgment did not invoke liability based on the offer, issuance, sale, or purchase of securities. Therefore, § 1125(e) was inapplicable.

■ Huse further contends that the Norwegian Judgment violates § 1144, which provides a jurisdictional requirement that any action to "revoke" a confirmation order on the grounds that it was procured by fraud must be initiated within 180 days after the entry of said order. 11 U.S.C. § 1141; *see also* 8 *Collier on Bankruptcy, supra,* ¶ 1144.04, at 1144–6.

The Norwegian Court of Appeal found that Huse had intentionally misled Frank Sporsem into believing that new value would be required in order to eliminate him from the new ownership. It ratified the Confirmation Order and the Plan's ownership transfer. The Norwegian Judgment did not revoke Plan confirmation, and thus § 1144 does not apply.

■ A bankruptcy court has power to remedy an injustice caused by fraud with damages after the 180–day deadline, without upsetting a confirmed plan or the finality of the confirmation order. *See* 8 *Collier, supra,* ¶ 1144.04[2][a], at 1144–7 (citing cases); *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, 181 B.R.

457, 462 (Bankr.D.Ariz.1995) (fraud action for money damages). Alternate relief for money damages is exactly what happened in this case, only it was afforded by the Norwegian court.

Huse counters that the Norwegian Judgment violated the spirit and purpose of the Code, as well as the Plan, to prevent a shareholder from collaterally attacking the equity ownership adjustment in a confirmed plan years afterwards. He maintains that our case is governed by *Clarke v. Mission Heights Invs., Inc. (In re Mission Heights Invs. Ltd. P'ship)*, 202 B.R. 131 (Bankr.D.Ariz.1996).

In *Clarke*, the heirs of the preconfirmation limited partner of the debtor, over four years after plan confirmation, sued the owners of the reorganized debtor and challenged the confirmed plan on the grounds that the proposed $330,000 new value contribution was never made. The plaintiffs sought reinstatement of their equity interest and participation in the profits. *Id.* at 137.

The bankruptcy court held that the claim was barred by § 1144's 180–day limitation and would be equitably denied because it was a "hindsight" claim by a party who "walked away from the enterprise as a limited partner, presumably after deciding that he did not wish to throw good money after bad" and who "had no further monetary interest in the debtor, ... except for the limited fraud grounds." *Id.* at 138. Moreover, the court opined that the confirmed plan vested all assets in the reorganized debtor and "terminate[d] all rights and interests of equity security holders and general partners" as provided for by the plan. *Id.* at 135 (citing 11 U.S.C. §§ 1141(a) and (d)(1)(B)).

The facts in *Clarke* are distinguishable. Here, the plaintiff, Frank Sporsem, was not a direct shareholder of BFI, but rather of Huse–Sporsem, and Huse's liability un-

der the Norwegian Judgment also arose from his shareholder status in Huse–Sporsem. The litigation did not adjust any ownership rights determined in the Plan, but only affected rights against Huse as an individual shareholder. Damages measured by the lost profits were awarded, but neither BFI or Bochica were parties, whereas in *Clarke*, the plaintiff sought the lost profits directly from the reorganized debtor.

Moreover, in *Clarke*, the bankruptcy court was looking at the claim for the first time. In contrast, we have a Norwegian Judgment for breach of fiduciary duty and fraud decided under Norwegian corporate law. The judgment is valid and binding in its own right. It would be an injustice to allow Huse to keep the fruits of what was found to have been wrongfully taken from the other shareholders to whom Huse owed a duty under Norwegian law.

Since the Norwegian Judgment did not violate the Code, the state court correctly determined that it was enforceable.

### CONCLUSION

The bankruptcy court had exclusive subject matter jurisdiction to collaterally attack the state court order and review the Norwegian Judgment. The Norwegian Judgment neither conflicted with the confirmed Plan nor the Code. Because the state court had correctly decided the bankruptcy issues before it, the bankruptcy court did not err in refusing to enjoin the state court's enforcement order. We therefore **AFFIRM** the bankruptcy court's summary judgment and dismissal.